

**FILED**
SEP 13 2018
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
       DEPUTY CLERK

McGREGOR W. SCOTT
United States Attorney
TODD A. PICKLES
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:16-CR-0210 TLN |
| Plaintiff, | PLEA AGREEMENT |
| v. | |
| CLAUDIA HUMPHREY, | |
| Defendant. | |

## I.   INTRODUCTION

**A.   Scope of Agreement.**

The indictment in this case charges the defendant Claudia Humphrey (hereinafter "defendant") in Counts One through Ten with Theft of Public Money, in violation of Title 18, United States Code Section 641, in Count Eleven with Obstruction of a Federal Audit, in violation of Title 18, United States Code Section 1516, and in Counts Twelve through Sixteen with Alteration or Falsification of Records in a Federal Investigation, in violation of Title 18, United States Code Section 1519. The defendant desires and agrees to plead guilty to Counts Seven and Fourteen. This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case. This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

PLEA AGREEMENT                                           1

**B.     Court Not a Party.**

The Court is not a party to this plea agreement. Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of defendant, including activities which may not have been charged in the indictment. The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw her guilty plea, and she will remain bound to fulfill all of the obligations under this plea agreement. The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence she will receive.

## II.     DEFENDANT'S OBLIGATIONS

**A.     Guilty Plea.**

The defendant will plead guilty to Count Seven, charging her with Theft of Public Money, in violation of Title 18, United States Code Section 641, and to Count Fourteen, charging her with Alteration or Falsification of Records in a Federal Investigation, in violation of Title 18, United States Code Section 1519. The defendant agrees that she is in fact guilty of these charges and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case. The defendant understands and agrees that she will not be allowed to withdraw her pleas should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by her in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement. The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

**B.    Remand.**

The defendant acknowledges that upon entry of her plea she may be remanded into custody pursuant to 18 U.S.C. § 3143 unless she can show by clear and convincing evidence that she is not a risk of non-appearance or a danger to the community. The government will not oppose defendant's request to remain out of custody until the time for the judgment and sentencing hearing provided that she does not violate any federal, state, or local law and remains in compliance with any terms or conditions of release that have been or that the Court may impose.

**C.    Restitution.**

Defendant agrees to pay restitution pursuant to 18 U.S.C. § 3663(a)(3) to the United States Department of Justice. The parties estimate the amount of restitution is at least $53,000 and up to $230,000. The defendant acknowledges that the United States is still investigating the case and that the restitution amount may exceed the current estimate.

The defendant understands that the factual basis of this plea agreement binds only the United States Attorney's Office for the Eastern District of California in this criminal case, and does not bind any agency of the United States in any other judicial, administrative, or other proceeding, or any state or local agency.

Restitution payments shall be by cashier's or certified check made payable to the Clerk of the Court. Defendant further agrees that she will not seek to discharge any restitution obligation or any part of such obligation in any bankruptcy proceeding.

**D.    Fine.**

The defendant reserves the right to argue to Probation and at sentencing that she is unable to pay a fine, and that no fine should be imposed. The defendant understands that it is her burden to affirmatively prove that she is unable to pay a fine, and agrees to provide a financial statement under penalty of perjury to the Probation Officer and the government in advance of the issuance of the draft Presentence Investigation Report, along with supporting documentation. The government retains the right to oppose the waiver of a fine. If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered by the Court, up to the statutory maximum fine for the defendant's offense.

### E. Special Assessment.

The defendant agrees to pay a special assessment of $100 on each count, for a total of $200, at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing. The defendant understands that this plea agreement is voidable at the option of the government if she fails to pay the assessment prior to that hearing. If the defendant is unable to pay the special assessment at the time of sentencing, she agrees to earn the money to pay the assessment, if necessary by participating in the Inmate Financial Responsibility Program.

### F. Violation of Plea Agreement by Defendant/Withdrawal of Pleas.

If the defendant violates this plea agreement in any way, withdraws her plea, or tries to withdraw her plea, this plea agreement is voidable at the option of the government. If the government elects to void the agreement based on the defendant's violation, the government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein. A defendant violates the plea agreement by committing any crime or providing or procuring any statement or testimony which is knowingly false, misleading, or materially incomplete in any litigation or sentencing process in this case, or engages in any post-plea conduct constituting obstruction of justice. Varying from stipulated Guidelines application or agreements regarding arguments as to 18 United States Code section 3553, as set forth in this agreement, personally or through counsel, also constitutes a violation of the plea agreement. The government also shall have the right (1) to prosecute the defendant on any of the counts to which she pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement. The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision. Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of

limitations between the signing of this plea agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this plea agreement. The determination of whether the defendant has violated the plea agreement will be under a probable cause standard.

In addition, (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

### G. Asset Disclosure.

The defendant agrees to make a full and complete disclosure of her assets and financial condition, and will complete the United States Attorney's Office's "Authorization to Release Information" and "Financial Affidavit" within five (5) weeks from the entry of the defendant's change of plea, including supporting documentation. The defendant also agrees to have the Court enter an order to that effect. The defendant understands that if she fails to complete truthfully and provide the described documentation to the United States Attorney's office within the allotted time, she will be considered in violation of the agreement, and the government shall be entitled to the remedies set forth in section II.E above, above.

### III. THE GOVERNMENT'S OBLIGATIONS

### A. Dismissals/Other Charges.

The government agrees to move, at the time of sentencing, to dismiss without prejudice the remaining counts in the pending indictment. The government also agrees not to reinstate any dismissed count except if this agreement is voided as set forth herein, or as provided in paragraphs II.E (Violation

PLEA AGREEMENT 5

of Plea Agreement by Defendant/Withdrawal of Plea(s)), VI.B (Estimated Guideline Calculation), and VII.B (Waiver of Appeal and Collateral Attack) herein.

    **B.**    **Recommendations.**

        1.    **Incarceration Range.**

The government will recommend that the defendant be sentenced to the low end of the applicable guideline range as determined by the Court.

        2.    **Acceptance of Responsibility.**

The government will recommend a two-level reduction (if the offense level is less than 16) or a three-level reduction (if the offense level reaches 16) in the computation of her offense level if the defendant clearly demonstrates acceptance of responsibility for her conduct as defined in U.S.S.G. § 3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

    **C.**    **Use of Information for Sentencing.**

The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, her attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

### IV. ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offenses to which the defendant is pleading guilty:

With respect to <u>Count Seven</u>, Theft of Public Money, in violation of Title 18, United States Code Section 641, the United States would have to prove the following of that offense:

    First, the defendant knowingly embezzled, stole, converted to her own use, or converted to the use of another money or property of value with the intention of depriving the owner of the use or benefit of the money or property;

PLEA AGREEMENT        6

Second, the money or property belonged to the United States, and

Third, the value of the money or property was more than $1,000.

With respect to <u>Count Fourteen</u>, Alteration or Falsification of Records in a Federal Investigation, in violation of Title 18, United States Code Section 1519, the United States would have to prove the following elements of that offense:

First, that the defendant knowingly altered, falsified, or made false entry in a document;

Second, that the defendant did so with the intent to impede, obstruct, or influence an investigation that she knew of or contemplated; and

Third, the investigation was about a matter within the jurisdiction of the Department of Justice, Office of Violence Against Women, a department and agency of the United States.

The defendant fully understands the nature and elements of the crimes charged in the indictment to which she is pleading guilty, together with the possible defenses thereto, and has discussed them with her attorney.

## V.     MAXIMUM SENTENCE

### A.     Maximum Penalty.

The maximum sentence that the Court can impose as to Count Seven, Theft of Public Money, in violation of Title 18, United States Code Section 641, is ten years of incarceration and the maximum that the Court can impose for Count Fourteen, Alteration or Falsification of Records in a Federal Investigation, in violation of Title 18, United States Code Section 1519, is twenty year of incarceration, for a total maximum period of incarceration of thirty years. The Court can also impose a fine of $250,000 on each count of conviction, for a total of $500,000. The Court can also impose a five-year period of supervised release and can impose a special assessment of $100 on each count of conviction, for a total of $200. By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific counts to which she is pleading guilty. The defendant further agrees, as noted above, that she will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

PLEA AGREEMENT                                          7

**B.  Violations of Supervised Release.**

The defendant understands that if she violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to three additional years imprisonment.

## VI.  SENTENCING DETERMINATION

**A.  Statutory Authority.**

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

**B.  Stipulations and Estimated Guideline Calculation.**

The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate to the following:

1.  Grouping

The parties estimate that Counts Seven and Fourteen will be grouped according to U.S.S.G. § 3D1.1 and § 3D1.2. The offense level is determined by the offense for the most serious offense, *i.e.*, the offense with the highest offense level. *See* U.S.S.G. § 3D1.3(a). The parties estimate that the highest offense level under the guidelines is under U.S.S.G. § 2B1.1 for Theft of Public Money, in violation of Title 18, United States Code Section 641, as opposed to that under U.S.S.G. § 2J1.2 for Alteration or Falsification of Records in a Federal Investigation, in violation of Title 18, United States Code Section 1519. Accordingly, the parties estimate that the offense guideline under U.S.S.G. § 2B1.1 will be used to determine the offense level for the grouped counts. Defendant however acknowledges if

PLEA AGREEMENT                                8

a higher offense level is calculated under a different section, including U.S.S.G. § 2J1.2, that section will be used in determining the applicable sentencing guidelines for the grouped counts.

    2.    Base Offense Level: **+6**

The base offense level for a violation of Title 18, United States Code Section 641 is six under U.S.S.G. § 2B1.1(a)(2).

    3.    Loss Amount: **+6/+10 (Estimated)**

The parties agree that the defendant embezzled, converted for her own purpose, or converted for the purpose of others at least $53,000 in federal grant money. The United States is permitted to argue in support of a loss amount up to $230,000 in misused grant money. Defendant may oppose any argument with respect to a loss higher than $53,000. The offense level will increase by at least 6 levels and up to 10 levels under U.S.S.G. § 2B1.1(b)(1)(D)-(F).

    4.    Aggravating role in the offense: **+2**

The parties agree that the defendant was a leader, manager, or supervisor in the offense, including that she was the director of Lift3 Support Group, Inc., and in that capacity directed and supervised the conduct of at least one other criminal participant in the offenses of theft of public money and creating false records in a federal investigation. Accordingly, the offense level is increased by two under U.S.S.G. § 3B1.1(b).

    5.    Obstruction Adjustment: **+2**

The parties agree that based on the defendant's plea to Alteration or Falsification of Records in a Federal Investigation, in violation of Title 18, United States Code Section 1519, a two-level increase applies under U.S.S.G. § 3C1.1. *See* U.S.S.G. § 3C1.1, appl. note 8.

    6.    Acceptance of Responsibility: **-3**

See paragraph III.B.2 above.

    7.    Estimated Adjusted Total Offense Level: **13 to 17**

Based on the foregoing stipulations and estimates, the parties estimate that the adjusted total offense level may be a low as 13 or as high as 17.

8. Criminal History: **No Agreement**

The parties do not have any agreements as to the defendant's criminal history. The defendant is permitted to object to or otherwise challenge any criminal history calculations determined by the Probation Officer and she preserves the right to argue that her criminal history category substantially over-represents the seriousness of her criminal history under U.S.S.G. § 4A1.3(b). For its part, the government is permitted to argue in support of any such calculations by the Probation Officer.

10. Departures or Other Enhancements or Reductions:

The defendant reserves the right to argue for any departure from the Sentencing Guidelines, or any deviance or variance from the Sentencing Guidelines under *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005). The United States reserves the right to oppose any such arguments.

## VII. WAIVERS

**A.  Waiver of Constitutional Rights.**

The defendant understands that by pleading guilty she is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to testify on her behalf; (e) to confront and cross-examine witnesses against her; and (f) not to be compelled to incriminate herself.

**B.  Waiver of Appeal and Collateral Attack.**

The defendant understands that the law gives the defendant a right to appeal her guilty plea, conviction, and sentence. The defendant agrees as part of her pleas, however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not exceed the high-end of the advisory sentencing range as determined by the Court, in which she case she would retain the right to appeal only her sentence. The defendant specifically gives up the right to appeal any order of restitution the Court may impose.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant understands that these circumstances occur infrequently and that in almost all cases this Agreement

constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever attempts to vacate her pleas, dismiss the underlying charges, or modify or set aside her sentence on any of the counts to which she is pleading guilty, the government shall have the rights set forth in Section II.E herein.

### C. Waiver of Attorneys' Fees and Costs.

The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed pursuant to this plea agreement and any charges previously dismissed).

### VIII. ENTIRE PLEA AGREEMENT

Other than this plea agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

## IX. APPROVALS AND SIGNATURES

### A. Defense Counsel.

I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

Dated: 9/13/2018

_Randy Sue Pollock_
RANDY SUE POLLOCK, ESQ.
Attorney for Defendant

### B. Defendant:

I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated: 9-13-18

_Claudia Humphrey_
CLAUDIA HUMPHREY
Defendant

### C. Attorney for United States:

I accept and agree to this plea agreement on behalf of the government.

Dated: September 13, 2018

McGREGOR W. SCOTT
United States Attorney

_/s/ Todd A. Pickles_
TODD A. PICKLES
Assistant United States Attorney

PLEA AGREEMENT                                12

EXHIBIT "A"

Factual Basis for Plea(s)

Defendant Claudia Humphrey was the executive director of LIFT3 Support Group, Incorporated ("LIFT3"). LIFT3 was a non-profit California organization established in 2004 by Humphrey and others. LIFT3 was based in Fairfield, Solano County, California. LIFT3's mission was to offer transitional shelter assistance and other services to victims of sexual assault, domestic violence, and dating violence, primarily serving residents in Solano County, California.

The United States Department of Justice ("DOJ"), Office on Violence Against Women ("OVW"), administered financial and technical assistance to communities throughout the United States that were developing programs, policies, and practices aimed at ending domestic violence, dating violence, sexual assault, and stalking. OVW provided grant funds for transitional housing, pursuant to 42 U.S.C. § 13975, and for culturally-specific services, pursuant to 42 U.S.C. § 14045a, for such victims. In order to obtain OVW grant funds, an applicant was required to submit an application to OVW setting forth the proposed use of the grant funds. OVW also required a budget identifying any positions within the organization that would be supported by the grant funds, including the job responsibilities of grant-funded staff and the amount of grant funds that would be used to support those positions, and any other activities or items for which grant funds would be spent, such as travel, equipment, supplies, and other costs. Applicants were also required to submit disclosures and attestations with respect to their compliance with DOJ and other federal regulations

If OVW accepted an application, it would issue an award setting forth the amount of the grant and all conditions governing the use of the grant funds, including compliance with OVW's Financial Grant Management Guide and the DOJ Office of Justice Programs Financial Guide. OVW required an official from the recipient organization to sign the award and acknowledge all of the conditions. Thereafter, OVW would make the awarded funds available to be drawn down by the grant recipient through the Grant Payment System ("GPRS"), an on-line system. A grant recipient would register with the system, which would generate a log-in and password associated with the recipient. Using this identification, the recipient could register a bank account into which OVW grant funds would be electronically transferred via the Automated Clearinghouse ("ACH"). Using the GPRS system, the recipient could cause money to be electronically drawn down from an OVW account established with the United States Treasury and, through ACH, deposited into the recipient's bank account in the amounts denominated by the recipient, not to exceed the total amount of the grant. OVW required recipients to keep financial documentation supporting the drawdowns and use of OVW grant funds and required that the recipients track and account for funds separately from any other grants awards by OVW or any other federal agency

On or about March 17, 2011, Humphrey, through LIFT3, applied for a transitional housing grant through OVW. The application sought a total of $250,000 for a three-year period to pay for services to assist victims of domestic violence, sexual assault, dating violence, and stalking in obtaining temporary or transitional housing. The budget identified two positions that would be funded, including approximately $61,000 to pay for Humphrey's salary over a three-year period based on Humphrey working 10 hours per week as the executive director of LIFT3.

On or about September 15, 2011, OVW awarded a transitional housing grant to LIFT3 in the amount of $250,000 for the period of October 1, 2011 and September 30, 2014. The award contained conditions requiring LIFT3 to comply with financial and administrative requirements, including rules that prohibited recipients from using grant funds to pay immediate family members without prior approval from OVW and to create policies that prevented conflicts of interest, including the involvement of immediate family members in the administration of federal grant funds. The award also required that the grant funds only be used for the purposes set forth in the recipient's grant application.

On or about September 20, 2011, Humphrey signed the $250,000 OVW grant award as the authorized official on behalf of LIFT3, and acknowledged all of the conditions of the grant.

On or about November 5, 2011, Humphrey enrolled a bank account controlled by her and her sister with the ACH to receive electronic funds transfers from the United States Treasury. Humphrey was the only employee at LIFT3 designated with a login to access the GPRS program to electronically draw down money. Humphrey and her sister were signatories and had control and access to the money in account ending 0641. Thereafter, between November 2011 and October 2012, Humphrey logged into GPRS and caused over $113,000 in OVW grants funds to be drawn down from the United States Treasury and deposited into accounts controlled by Humphrey and her sister.

On or about March 27, 2012, Humphrey, through LIFT3, submitted an application for a culturally-specific services program ("CLSSP") grant from OVW. The application sought a total of $300,000 to be used to provide various social and financial services for African-American victims of domestic violence, sexual assault, dating violence and stalking in seeking access to services. The budget identified three positions that would be funded under the grant, including $41,122 to pay for Humphrey's salary over a two-year period based on Humphrey working 10 hours per week as the executive director of LIFT3.

On or about September 20, 2012, OVW awarded a CLSSP grant to LIFT3 in the amount of $297,000 for the period of October 1, 2012 and September 30, 2014. The award contained conditions requiring LIFT3 to comply with financial and administrative requirements, including rules that prohibited recipients from using grant funds to pay immediate family members without prior approval from OVW and to create policies that prevented conflicts of interest, including the involvement of immediate family members in the administration of federal grant funds. The award also required that the grant funds only be used for the purposes set forth in the recipient's grant application.

On or about September 28, 2012, Humphrey signed the $297,000 OVW grant award as the authorized official on behalf of LIFT3, and acknowledged all of the conditions of the grant. On or about October 16, 2012, Humphrey enrolled a bank account controlled by her and her sister with the ACH to receive electronic funds transfers from United States Treasury. Humphrey and her sister were signatories and had control and access to the money in that account. Thereafter, between November 2012 and August 2013, Humphrey logged into GPRS and caused over $161,000 in OVW grants funds to be drawn down from the United States Treasury and deposited into account controlled by her and her sister.

In total, Humphrey caused over $274,000 in OVW grant funds to be drawn down from the United States Treasury and deposited into bank accounts controlled by her and her sister in violation of the grant awards preventing family members to have control or access of DOJ grant funds. Further, an audit of those accounts revealed that Humphrey caused checks to be paid to her sister and her son using DOJ grant funds despite representing that no funds would be used to pay immediate family members. The payments to her son were often disguised as payments to assist in the relocation of victims of domestic violence. Humphrey also used DOJ grant money to pay for personal items she purchased during a trip to Las Vegas, Nevada, as well as to draw a salary despite evidence demonstrating that Humphrey had not, in fact, worked on the approved projects.

At least $53,000 out of the $274,000 OVW funds was converted to personal use and the audit identified a larger figure of $230,000 that was mismanaged or misspent.

Humphrey also applied for grants with the California Office of Emergency Services ("OES"). The OES grants contained subgrants totaling $20,000 in federal funds. The OES grants had similar restrictions on the use of OES money, including federal funds, to pay immediate family members and controls on the use of OES funds. Unlike the OVW grant, Humphrey and LIFT3 employees were required to submit claims to OES to receive the funds. The claims were required to be signed by LIFT3's financial officer, and OES had certain requirements as to who could be a financial officer.

Humphrey had her sister, her niece, and another employee sign on the forms, purporting to be the financial officer. None of these employees had the requisite qualifications to be a financial officer.

In 2013, OVW received an email from a LIFT3 employee stating that the she and another employee had not been paid for several weeks and that victims were not being provided services due to a hold placed by OVW. In fact, OVW had only temporarily suspended the drawdowns for two days, and LIFT3 had been taking regular drawdowns up to the hold on funds and after it was lifted. Therefore, OVW was concerned that OVW grant funds were not being spent correctly and its staff conducted an unannounced visit of LIFT3 in August 2013.

During the visit in August 2013, OVW staff interviewed Humphrey and other employees. Humphrey was unable to provide documents supporting expenditures or any questions about use of OVW funds. She did not disclose that Karen Turner, a LIFT3 employee who had access to accounts into which OVW funds were deposited and was being paid, at times, using OVW funds, was her sister. Humphrey instructed the personnel at LIFT3 to lock certain doors that limited access to the offices to OVW staff. During the visit Humphrey appeared to generate a document purporting to show OVW grant money was spent on office computers (as authorized). An interview of LIFT3 employees revealed that no computers were actually purchased. Thereafter, OVW froze LIFT3's grant money. However, Humphrey continued to request money from Cal. OES.

In October 2014, OVW began a formal audit of LIFT3 both respect to the OVW funds as well as the $20,000 in federal funds provided via OES. The auditors sought documents and interviewed witnesses. Humphrey submitted time sheets, which she signed, purporting to show her work on matters authorized under the grant. In fact, evidence showed that Humphrey was out of town on personal matters unrelated to grant-authorized work during the time periods of she identified in the time sheets. Humphrey also submitted an expense ledger purporting to show she was withholding payroll taxes for her employees funded through the OVW grant and as required by DOJ regulations. In truth, Humphrey was not withholding those taxes as represented. Humphrey also had her niece, who worked at LIFT3, sign backdated time sheets.

A number of employees were interviewed during the course of the subsequent DOJ, Office of Inspector General investigation. A former employee reported that Humphrey asked her to falsify records once the audit commenced. Others indicated that despite the fact that LIFT3 was taking regular drawdowns of DOJ grant money, employees reported that there were numerous times when they were not regularly paid. The employees stated that Humphrey was in charge of the finances. Further, although the budget by LIFT3 stated that the funded-employees would receive money to pay for healthcare and have their payroll taxes withheld and remitted to the Internal Revenue Service, Humphrey did neither of these things.

As to Count Seven, on or about April 6, 2013, Humphrey caused a check in the amount of $1,490.39 to be paid using DOJ grant funds to her sister. This money was paid only weeks after Humphrey represented to DOJ, OVW that no immediate family members were being paid with DOJ grant funds.

As to Count Fourteen, on or about January 13, 2015, Humphrey made or caused to be made a false time sheet that purported to account for her time working on a DOJ-funded project. In truth, Humphrey was out of town at the time she reported working. Humphrey prepared the false document to impede the DOJ, OVW investigation with respect to her embezzlement, conversion, or misuse of DOJ grant money.

As part of this agreement, the defendant Claudia Humphrey admits that she knowingly and intentionally embezzled, converted for her own use, or converted for the use of another grant funds from the Department of Justice, and that she knowingly and intentionally falsified, or caused to be falsified records for the purpose of impeding an investigation by the Department of Justice, Office of Violence Against Women, in connection with the use of grant funds.

   The conduct set forth above is not meant to be exhaustive and is merely an example of Humphrey's conduct in furtherance of the alleged theft of public money and the alteration or falsification of records in a federal investigation.

   I have reviewed the entire factual basis in Exhibit A above and, as far as my own conduct is concerned, I adopt it as my own true statement.

DATED: 9\13\18

*[signature]*
CLAUDIA HUMPHREY, Defendant